No. 25-1616

# United States Court of Appeals
# for the Federal Circuit

VICOR CORPORATION,

*Appellant,*

V.

INTERNATIONAL TRADE COMMISSION,

*Appellee,*

FII USA INC., INGRASYS TECHNOLOGY INC.,

*Intervenors.*

On Appeal from the United States
International Trade Commission
in Investigation No. 337-TA-1370

**BRIEF FOR *AMICUS CURIAE*
SPARK US INNOVATION, INC.
IN SUPPORT OF APPELLANT AND REVERSAL**

Erik S. Jaffe
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
ejaffe@schaerr-jaffe.com

*Counsel for Amicus Curiae*

AUGUST 20, 2025

# CERTIFICATE OF INTEREST

Case No.:   25-1616
Caption:    *Vicor Corporation v. International Trade Commission*

Filing Party/Entity: Amicus Curiae: Spark US Innovation, Inc.

1.    Represented Entities (Fed. Cir. R. 47.4(a)(1)):

Spark US Innovation, Inc.

2.    Real Party in Interest (Fed. Cir. R. 47.4(a)(2)):

None/Not Applicable.

3.    Parent Corporations and Stockholders: (Fed. Cir. R. 47(a)(3)):

None/Not Applicable.

4.    Legal Representatives (Fed. Cir. R. 47.4(a)(4)):

Schaerr Jaffe LLP: Erik S. Jaffe

5.    Related Cases. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

Not Applicable (amicus).

6.    Organizational Victims and Bankruptcy Cases (Fed. Cir. R. 47.4(a)(6)).

None/Not Applicable.

I certify the above information is accurate and complete to the best of my knowledge.

Date: August 20, 2025

*/s/ Erik S. Jaffe*
Erik S. Jaffe

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .................................................................2

TABLE OF AUTHORITIES.....................................................................ii

IDENTITY AND INTEREST OF *AMICUS CURIAE* AND
  SOURCE OF AUTHORITY TO FILE BRIEF.....................................1

SUMMARY OF ARGUMENT ..................................................................2

ARGUMENT ......................................................................................4

 I. Embedding Patent Licenses in Purchase Orders Fosters
   Uncertainty and Abuse..................................................................6

   A. Informal means of inferring acceptance of
    intellectual property licenses or transfers create
    severe uncertainty and ambiguity. .....................................6

   B. Incorporated state law should not be allowed to
    conflict with federal policy and interests. ........................10

   C. Heightened contracting safeguards are common in
    other areas dealing with important rights and
    property.........................................................................14

 II. This Case Requires a Reasoned Decision and Potential
   Remand for the ITC to Properly Consider the Federal
   Interests at Stake. ....................................................................17

CONCLUSION ...................................................................................19

CERTIFICATE OF COMPLIANCE..........................................................21

CERTIFICATE OF SERVICE.................................................................22

# TABLE OF AUTHORITIES

**Cases**                                              **Page(s)**

*Am. Steel & Wire Co. v. Speed,*
192 U.S. 500 (1904) ...................................................................7

*Carbice Corp. of Am. v. Am. Pats. Dev. Corp.,*
283 U.S. 27 (1931) ....................................................................7

*Eldred v. Ashcroft,*
537 U.S. 186 (2003) .................................................................12

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) .................................................................18

*Mayborn Grp., Ltd. v. Int'l Trade Comm'n,*
965 F.3d 1350 (Fed. Cir. 2020)................................................17

*Sears, Roebuck & Co. v. Stiffel Co.,*
376 U.S. 225 (1964) ...........................................................12, 13

*United States v. Kimbell Foods, Inc.,*
440 U.S. 715 (1979) .................................................................12

**Statutes**

15 U.S.C. § 1058 ...........................................................................10

28 U.S.C. § 1652 ...........................................................................11

35 U.S.C. § 154 .............................................................................10

ALASKA STAT. ANN. § 13.26.600 (2024)......................................15

CAL. PROB. CODE § 4121 (2000) ...................................................15

COLO. REV. STAT. ANN. § 15-11-502.............................................15

UTAH CODE ANN. § 75A-2-105 (2024) ..........................................15

## Regulations

16 C.F.R. § 314.1 ................................................................. 16

34 C.F.R. § 300.504 ............................................................ 15

## Other Authorities

Restatement (Second) of Contracts § 110 ............................... 15

Jeanne Suchodolski et al.,
  *Innovation Warfare*, 22 N.C. J.L. & Tech. 175 (2020) ......................... 19

U.C.C. § 2-207 ...................................................................... 8

## IDENTITY AND INTEREST OF *AMICUS CURIAE* AND SOURCE OF AUTHORITY TO FILE BRIEF[1]

SPARK US Innovation, Inc., an organization dedicated to advancing innovation and protecting intellectual property rights, has a strong interest in this case. The intersection of contract law and patent law directly impacts the clarity and enforceability of patent licenses, which are critical for fostering innovation and balancing the rights of patent holders with public access to inventions. Ensuring that patent licenses adhere to uniform federal standards is essential for maintaining a robust and equitable patent system that supports both creators and the public.

This brief is filed without objection from the responding parties and with the express consent of Vicor Corporation. A motion for leave to file also accompanies this brief.

---

[1] No party's counsel authored this brief in whole or in part, and no person other than *amicus* or its counsel contributed money that was intended to fund the preparation or submission of the brief.

## SUMMARY OF ARGUMENT

The United States International Trade Commission (ITC) determined that purchase orders for discrete products to be purchased by Foxconn from Petitioner/Appellant Vicor Corporation included a perpetual, global, irrevocable, and royalty-free license to "all intellectual property rights" included in the supplied products, including not merely the use of the purchased product itself, but also the right to "make, use sell, offer to sell or import similar products or other products which contain the aforesaid intellectual property rights worldwide." Appx12336. For purposes of this case, the ITC focused on U.S. Patent No. 9,516,761 (the '761 patent) practiced by the product sold, but the scope of its holding and the license it endorses go far beyond that and encompass all manner of intellectual property, including trademarks.

That such a sweeping grant of a worldwide royalty-free license to all intellectual property rights was buried in a purchase order for discrete goods and purportedly transferred federally protected rights worth exponentially more than the goods being purchased is beyond absurd. While it is almost certain that the ITC misapplied Massachusetts law on this point, even if the ITC correctly read such state law, the federal

interests at stake are such that federal guardrails are necessary to limit or preempt such absurd results that meaningfully conflict with many federal interests. *Amicus* thus urges the Court to establish, if necessary, minimum federal standards, consistent with nationwide interpretations of the Uniform Commercial Code (UCC), that insist on clear and specific indicia of agreement about the sale, licensing, or transfer of federally created and protected intellectual property rights. Such clear indicia could be reflected in express agreements to such transfers reflected in the final written exchanges between the parties and include procedural safeguards such as separate signatures on clauses purporting to transfer intellectual property rights or other limitations on the inadvertent or deceptive transfer of such rights. Absent clear minimum indicia of agreement about such valuable and important rights, there would be no agreement and no transfer of those rights, as Vicor suggests here in its battle of conflicting forms analysis.

Guardrails around the purported transfer of federally protected intellectual property rights are especially important in cases such as this one, where the claimed license was the result of a deceptive attempt by a Chinese company to steal an American company's intellectual property

and circumvent express protections for those rights. That current U.S. trade and economic policy is particularly concerned with curbing such trade abuses, combatting theft of IP, and encouraging American innovation is all the more reason to cabin the application of non-federal rules that would allow such chicanery. Indeed, the ITC, a creature of the Executive Branch, seems to be flying in the face of federal policy and interests—particularly as they relate to China's efforts to steal U.S. intellectual property.

Finally, the important federal interests at stake warrant a reasoned opinion by this Court explaining whatever outcome it reaches, rather than a one-word summary disposition that fails to grapple with such underlying concerns or discourage future error. Alternatively, the misalignment between a federal agency and federal policy would justify a remand for further consideration and reasoning from the ITC and allow potential input from the Executive Branch on whether the unusual reading of state law here protects federal interests.

## ARGUMENT

*Amicus* agrees with Appellant Vicor that the purchase orders and e-mail exchanges at issue in this case do not create a contract granting a

perpetual free license to Vicor's intellectual property. Vicor Br. 28–31. *Amicus* particularly agrees that the ITC misread and misapplied Massachusetts law and the UCC to reach an absurd result that contradicted the baseline rules of engagement expressly incorporated into Vicor's price quotation at the beginning of each project and into each final acceptance of a purchase order pursuant to those pre-established terms. Vicor Br. 13–15, 29–30. At best, there was no meeting of the minds, as Vicor suggests, at 37, and hence no possible grant of a free license to intellectual property worth many times more than the goods being sold.

But even assuming that Massachusetts law inexplicably allows such a bizarre and abusive deviation from the contracting ground rules established by Vicor, because the interests at stake are federal rights created and protected by federal law, this Court should limit the application of state law where it so severely conflicts with and undermines federal interests by allowing deceptive or inadvertent vitiation of patent and other intellectual property rights.

## I.    Embedding Patent Licenses in Purchase Orders Fosters Uncertainty and Abuse.

Allowing the transfer of intellectual property rights through the hidden inclusion of rights-granting clauses in purchase orders and the supposed acceptance of those grants through the ordinary and informal logistical discussions preceding formal acceptance of an order for goods is a recipe for uncertainty, ambiguity, and trickery. Federal rights should not rise and fall on such gamesmanship or be subject to such uncertainty. Rather, there should be uniform minimum standards applied to sales or other purported transfers of such rights. Such standards are necessary to ensure that federal interests and policy regarding intellectual property and foreign trade are not undermined by idiosyncratic and implausible state law. While incorporation of consensus state-law UCC rules will generally avoid such conflict, federal guardrails are needed to prevent outlier interpretations or absurdities, such as the ITC decision here.

### A.    Informal means of inferring acceptance of intellectual property licenses or transfers create severe uncertainty and ambiguity.

Purchase orders are typically cookie-cutter transactional documents primarily designed for specifying details such as price, quantity, and delivery terms for a concrete and limited sale of discrete

6

goods. Such goods are often commodities with pre-set pricing and pre-determined characteristics: electronic components, machine parts, or even cookies (or cookie cutters). The purchase and sale of such items focus primarily on price, quantity, delivery, and allocation of risk and responsibility for damage, delay, or defect. *See Am. Steel & Wire Co. v. Speed*, 192 U.S. 500, 512–13 (1904) (detailing the terms of one such contract for goods). Such recurring and discrete transactions in physical goods are ill-suited for addressing the complexities of broad intellectual property licensing, which regularly involve precise limits on scope, duration, royalties, geographic range, field-of-use, and termination conditions. *Cf. Carbice Corp. of Am. v. Am. Pats. Dev. Corp.*, 283 U.S. 27, 30–31 (1931). Indeed, the breadth and divisibility of intellectual property rights renders licensing a complex exercise that is negotiated in detail at arms-length, not casually slipped into an agreement regarding some other primary exchange of goods.

Here, the ITC concluded that purchase orders for a limited number of discrete physical goods included a broad, perpetual, irrevocable, and royalty-free license to "all intellectual property rights" in the supplied products, covering, at a minimum, the '761 patent. That overreaching

clause conflicted with the baseline purchase rules established by Vicor's price quotation issued at the start of the project and conflicted with Vicor's final and formal Sales Order Acknowledgement (SOA) by which it accepted the proposed purchase but expressly rejected any claims on its IP rights. *See* Vicor Br. 3. Nonetheless, the ITC bizarrely found that the conflicting purchase orders, slipped into intermediate e-mail exchanges regarding delivery timing and detail, combined with the failure of non-managerial employees to expressly disavow such deceptive property grabs, formed binding contracts under Massachusetts law and the Uniform Commercial Code (UCC) § 2-207.

However, the vague and broad language in the purchase orders, coupled with the merely implied acceptance of such terms, risks misinterpretation and disputes over the scope and enforcement of intellectual property rights and undermines the economic incentives such federal rights are designed to create. The problem with implied agreements regarding IP rights is evident in the ITC's decision itself, when it imagines, expansively and erroneously, that the purchase order contained the "essential components of the sale" in which the parties agreed to "product, price, and quantity." ITC Op. at 109. But the essential

components of the sale of discrete goods worth a particular per unit price is vastly different than the essential components of a sale of intellectual property rights to reproduce such goods yourselves and sell them world-wide—and in competition with the initial seller and patent holder to boot. That the ITC implied such a broader agreement from the narrow logistical discussions of delivering discrete goods is a sheer absurdity. And its suggestion that a clause slipped into a purchase order and contrary to hundreds of past transactions would have that disproportional effect goes beyond nonsensical, it actively corrupts the patent system and all other federal protections for intellectual property.

To avoid the uncertainty of such sub-rosa theft of intellectual property, federal law should set guardrails that require express, specific, and identifiable agreement to terms that bear on such rights, not merely implied acceptance of such terms slipped unilaterally into purchase orders involving discrete goods rather than global licensing rights. While most, if not all, state-law applications of the UCC will easily stay within such guardrails, idiosyncratic or erroneous interpretations of state law, such as the decision below, do not. The ITC's approach to implying a broad license to use Vicor's intellectual property in this case undermines

multiple federal interests, is inconsistent with more common and sensible applications of the UCC, and runs afoul of sensible federal guardrails.

### B. Incorporated state law should not be allowed to conflict with federal policy and interests.

Federal guardrails are important in this area because protecting federal intellectual property, encouraging domestic innovation, and combatting foreign trade abuses are all areas of strong federal interest. The license's purported coverage of "all intellectual property rights," including patents, trademarks, copyrights, and trade secrets, introduces significant surprise and uncertainty. And, on the facts, it cannot be squared with Vicor's express rejection of such terms—particularly given the ambiguity inherent in the use of sweeping language purporting to cover rights normally subject to detailed terms, conditions, and negotiated limits.

Federal law governs each type of intellectual property with a distinct legal framework with varying durations, transferability rules, and enforcement mechanisms. For example, patents have a fixed term of 20 years, 35 U.S.C. § 154(a)(2), while trademarks can be renewed indefinitely, 15 U.S.C. § 1058(a), and trade secrets last as long as

confidentiality is maintained. By lumping these rights together in a single, broad license, the purchase orders substitute breadth for clarity and detail, risking dispute and rendering property rights uncertain or without value. Hidden clauses and implied acceptance are a sure-fire means of undermining federal rights meant to be clear, uniform, and protective of American innovation and trade. Allowing sweeping clauses that essentially vitiate all intellectual property rights to be incorporated by anything less than specific and express agreement invites abuse, uncertainty, and continuous litigation, including by foreign companies seeking an end-run around U.S. intellectual property protections.

When federal law incorporates state law as the rule of decision under federal statutes, such incorporation is subject to significant limitations to ensure alignment with federal policy and maintain uniformity. The Rules of Decision Act directs federal courts to apply state law in certain cases, but that general direction yields when "the Constitution or treaties of the United States or Acts of Congress otherwise require or provide[.]" 28 U.S.C. § 1652. Put differently, if "state law would frustrate specific objectives of … federal programs," then they

do not apply. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979).[2]

Patent law, as a creature of exclusive federal statute, is a subject that requires federal uniformity. And the Supreme Court has repeatedly said as much. Even where federal patent law intersects with state contract law, the "point insistently made" is "no more and no less than this: *States* may not enact measures inconsistent with the federal patent laws." *Eldred v. Ashcroft*, 537 U.S. 186, 202 n.8 (2003) (emphasis in original) (citing *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 231 (1964)). That means that a State can neither "encroach upon the federal patent laws directly" nor "give protection of a kind that clashes with the objectives of the federal patent laws." *Sears, Roebuck & Co.*, 376 U.S. at 231. Where such conflict exists, federal law and the Supremacy Clause

---

[2] Of course, the ITC is not a federal court, it is an Executive Branch agency engaging in a quasi-judicial function. In deciding what law to apply when faithfully executing its function of regulating imports that may violate U.S. patent rights, it is far from clear whether the ITC is bound to apply state law or restricted from pursuing federal policy goals with more protective rules governing claimed license defenses. The implications of that potential policy discretion by an executive branch agency are discussed *infra*, in Part II.

limit the application of state law, allowing it as a rule of decision only when consistent with federal policy and interests. *See id.*

The reason for this interest in national uniformity requires little imagination. Uniform patent law ensures consistent and predictable outcomes across jurisdictions, prevents forum shopping, and ensures equitable enforcement. Relying on varied, imprecise, or idiosyncratic state contract law to govern the implied creation of patent licenses risks creating inconsistent and absurd outcomes.

For example, different states laws might require different default interpretations of otherwise innocuous communications, leading to unpredictable legal results and encouraging forum shopping. The ITC here, for example, read (or misread) Massachusetts law to imply acceptance of peripheral clauses attached to an order for goods that then created free rights to intangible property worth exponentially more than the goods being purchased. And, while a proper reading of the UCC would almost always provide safeguards for patent holders that are consistent with federal interests, it behooves this Court to establish at least a federal minimum standard as a guardrail to protect against idiosyncratic

and under-protective state or agency interpretations of the UCC and contract law in general.

To avoid unpredictability, absurdity, and nonuniformity, such guardrails should, at the very least, require express consent to the transfer of federal intellectual property rights and ensure that licenses are clear, specific, and compliant with federal intellectual property (and trade) policy. Federal intellectual property rights—sometimes temporary, sometimes permanent, and often extremely valuable—are surely of a class that requires such a heightened degree of caution and certainty comparable to the concerns the law has regarding other transactions involving important property or rights.

## C.    Heightened contracting safeguards are common in other areas dealing with important rights and property.

Such heightened standards would not be unusual given the importance of the rights at issue. Contract law already imposes heightened clarity, formality, or procedural safeguards for certain transactions due to their importance and significant long-term implications.

The Statute of Frauds, for example, requires contracts for the sale of real property to be in writing to ensure clarity, prevent disputes, and protect the significant, long-term rights associated with property ownership. *See* Restatement (Second) of Contracts § 110. Similarly, when assigning powers of attorney, states often require notarization or witnesses to validate the grant of authority, confirming the principal's intent and protecting against fraud or misunderstanding. *E.g.*, ALASKA STAT. ANN. § 13.26.600 (2024) (formerly at ALASKA STAT. ANN. § 13.26.357 (2017)) (notary); UTAH CODE ANN. § 75A-2-105(1) (2024) (formerly UTAH CODE ANN. § 75-9-105 (2022)) (notary); CAL. PROB. CODE § 4121(c) (2000) (notary or two witnesses). Analogous rules often attend the creation of wills. *E.g.*, COLO. REV. STAT. ANN. § 15-11-502(1)(c)(I)-(II) (2010) (notary or two witnesses).

Contracts involving sensitive information or significant rights, such as those created under the Individuals with Disabilities Education Act, similarly must satisfy heightened requirements for knowing agreement to disclose information or waive rights. For example, 34 C.F.R. § 300.504 requires schools to provide parents with notice of *all* the applicable procedural safeguards available to them and their children with

15

disabilities. And the Federal Trade Commission's Safeguards Rule, found at 16 C.F.R. Part 314, establishes "standards for developing, implementing, and maintaining reasonable administrative, technical, and physical safeguards to protect the security, confidentiality, and integrity of customer information," 16 C.F.R. § 314.1(a).

Patent licenses, which grant rights to use intellectual property, are at least as significant, as they can affect competition, innovation, and economic outcomes for years. Allowing merely implied agreements to broad licenses—snuck into purchase orders attached to routine exchanges regarding a more limited sale of goods—fails to provide the necessary clarity, specificity, and assurance of a knowing agreement regarding the claimed transfer of such important rights. And that loose approach needlessly injects ambiguity and litigation risk into a process where a mistake's consequences may be disastrous for the patent holder.

Under such proposed minimum standards for express and clear agreement, federal courts can in almost all cases continue to incorporate consensus state law under the UCC to respect the rule of states yet provide the necessary uniformity in this area of federal concern. The

federal baseline would simply guard against peculiar variations or misinterpretations that undermine federal interests, as in this case.

## II.    This Case Requires a Reasoned Decision and Potential Remand for the ITC to Properly Consider the Federal Interests at Stake.

Finally, in deciding this case, the Court should not invoke Local Rule 36 to summarily affirm the ITC's February 2025 reversal of the ALJ's October 2024 determination. The public's need for transparency demands an explanation—especially when three political appointees (with three vacant seats) reversed the initial decision of the ALJ, contradicted the reasoning of a district court, and put them seriously at odds with Executive Branch policy.

The ITC's ruling undermines patent protections, global contracting norms, and fair commercial expectations. There is simply too much going on in the record for this Court to avoid explaining its reasoning for a decision with a written opinion.

And the fact that questions of contract formation based on written evidence are questions of law to be reviewed *de novo*, *Mayborn Grp., Ltd. v. Int'l Trade Comm'n*, 965 F.3d 1350, 1353 (Fed. Cir. 2020); Vicor Br. at 31–32, is all the more reason for the Court to explain its independent

reasoning rather than defer without explanation. *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (no deference for statutory interpretation).

Rule 36 affirmances evade this duty to the detriment of the public. They are at odds with the APA's command for reasoned decisions and deny due process to patent holders whose property interests are extinguished without explanation. In high-stakes IP-trade cases like this one, the Court should issue a written opinion that rejects the ITC's implausible reading of Massachusetts law or, if it agrees with that reading, holds that such unusual state law reasoning and results undermines important federal interests and should not be incorporated given the guardrails outlined above.

Finally, and in the alternative, if the Court is uncertain about the extent of the federal interests in this case, whether they were even considered by the ITC, or how severely they are undermined by the ruling below, it should at least remand to the ITC to consider such issues in the first instance and allow other parts of the Executive Branch, to which the ITC belongs, to weigh in with direction or briefing regarding how federal policies regarding intellectual property, American innovation, and trade

with China bear on the circumstances in which a Chinese company can deceptively steal the intellectual property rights of an American company making innovative products.[3]

## CONCLUSION

This case involves an implausible implied contract transferring valuable intellectual property rights based on unrelated logistical exchanges between non-managerial employees.  It is likely wrong on its own terms, but if not, it frustrates multiple federal interests. Idiosyncratic state law requiring that result should not be incorporated as the rule of decision in such circumstances. The judgment of the ITC should be reversed or, at a minimum, vacated and remanded to require proper consideration of whether Massachusetts law, as it has interpreted it, so conflicts with federal policies and interests that an executive agency should not incorporate such law as a federal rule of decision.

---

[3] *See* Jeanne Suchodolski et al., *Innovation Warfare*, 22 N.C. J.L. & Tech. 175, 177 & n.2 (2020) (summarizing "government and private studies document[ing] a systematic and coordinated effort by China to achieve technical and economic dominance through misappropriation of U.S. technology" (collecting sources)).

Dated: August 20, 2025          Respectfully submitted,

/s/ Erik S. Jaffe
Erik S. Jaffe
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136
ejaffe@schaerr-jaffe.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Case No. 25-1616
*Vicor Corporation v. International Trade Commission*

The foregoing brief complies with the type-volume limitation of Federal Circuit Rule 29(b), and the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6), because it has been prepared with a proportionally-spaced typeface using Century Schoolbook 14-point type and includes 3,522 words.

Dated: August 20, 2025

*/s/ Erik S. Jaffe*
Erik S. Jaffe

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on August 20, 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

Respectfully submitted,

*/s/ Erik S. Jaffe*
Erik S. Jaffe

*Counsel for Amicus Curiae*